

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
03/03/2017

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Bill Jay Bird,** | § | **Case No. 11-36001** |
| | § | |
| **Debtor.** | § | **Chapter 7** |
| | § | |

**MEMORANDUM OPINION REGARDING:  (1) THE CHAPTER 7 TRUSTEE'S
MOTION FOR AUTHORITY TO MAKE INTERIM DISTRIBUTION; AND (2) THE
DEBTOR'S OBJECTION TO THE CHAPTER 7 TRUSTEE'S MOTION FOR
AUTHORITY TO MAKE DISTRIBUTION**
[Doc. Nos. 175 & 177]

## I.   INTRODUCTION

Bill Jay Bird (the "Debtor") has found himself in a difficult situation:  on one hand, he seeks the shelter and protection of the bankruptcy court from his creditors; but on the other, he wishes to manipulate the system in such a manner that he comes out on top instead of paying his creditors.  His tactics go against the very bedrock of bankruptcy that seeks "to provide a 'fresh start' to individuals and to provide an equitable distribution to creditors."  Robert J. Landry, III, *Ten Years After Consumer Bankruptcy Reform in the United States:  A Decade of Diminishing Hope and Fairness*, 65 CATH. U.L. REV. 693, 694 (2016); *see also In re Jordan*, 428 B.R. 430, 434 (Bankr. N.D. Ohio 2010) ("[I]t is abuse for a debtor to seek to use the bankruptcy process to obtain a head start.").

Here, the Debtor executed a settlement agreement in which he waived all rights to object to the claims of RES-CA Nandina Groves, LLC ("RES"), the largest creditor in this case.  In exchange, for waiving these rights, the Debtor was able assist his family members to maintain title and control of a luxury, beachfront mansion located on Capistrano Beach in California.  However, the Debtor is now crawfishing on this agreement by asserting that RES is not entitled

1

to its proposed distribution of estate funds.  The Debtor is not taking this position out of concern

for other creditors; rather, he does so because there are no other creditors, and if he can prevent

RES from receiving a distribution, these funds would be distributed to him.  *Matter of First*

*Colonial Corp. of Am.*, 693 F.2d 447, 450–51 (5th Cir. 1982) (stating that courts typically return

surplus to the debtor); *In re Moon*, 258 B.R. 828, 832 (N.D. Fla. 2001) ("[U]nder § 726 all

surplus funds shall be returned to the debtor.") (citation omitted).  Thus, the Debtor is attempting

to have his cake and eat it too:  he has saved the mansion for his family and is now attempting to

cheat RES out of over three quarters of a million dollars in estate funds.  His tactics will not

work.  Indeed, they reflect a level of greed aptly characterized by the Fifth Circuit as "a principle

of too much . . . when a pig becomes a hog it is slaughtered." *Matter of Swift*, 8 F.3d 929, 931

(5th Cir. 1993) (internal citation and quotation omitted)  The Court issues this Memorandum

Opinion to underscore the sanctity of settlement agreements and the need to enforce all of their

terms, as well as to emphasize that it will not reward gluttonous debtors.

The Court now makes the following Findings of Fact and Conclusions of Law under

Federal Rule of Civil Procedure 52, as incorporated into Bankruptcy Rules 7052 and 9014.[1]  To

the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such;

and to the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as

such.  Further, this Court reserves the right to make additional findings and conclusions as it

deems necessary or as requested by any party.  For the reasons set forth herein, this Court

overrules the Debtor's objection to the chapter 7 trustee's proposed distribution of estate funds

---

[1] Any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure.  Further, any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

and will therefore grant the trustee's motion for authority to make an interim distribution to holders of allowed claims.

## II.   FINDINGS OF FACT

### A. The Creation of the Trusts

1. On December 6, 1983, the Debtor and his wife, Vicki L. Bird ("Ms. Bird"), created the Bird Family Trust (the "Family Trust") and became trustees of that trust. [Debtor's Ex. No. 4, p. 4 of 15[2]]. At some point thereafter, the Family Trust took title to certain luxurious beachfront property located at 35121 Beach Road, Capistrano Beach, California (the "Property").

2. On November 26, 2001, the Debtor and Ms. Bird, in their capacities as trustees of the Family Trust, executed a Trust Transfer Deed conveying the Property to the Debtor and Ms. Bird as their community property. [Id.].

3. That same day, November 26, 2001, the Debtor and Ms. Bird entered into the Interspousal Transfer Deed. [Debtor's Ex. No. 3]. This deed transferred to both the Debtor and Ms. Bird a separate, individual, 50% interest in the Property. [Id.].

4. Also, on November 26, 2001, the Debtor created the B.J. Bird Residence Trust (the "Debtor's Trust"). [Debtor's Ex. No. 5, p. 21 of 26]. The Debtor designated his children, Shannon M. Bird and Dylan C. Bird (the "Debtor's Trustees"), as trustees of the Debtor's Trust. [Id. at p. 5 of 26]. The Debtor's Trust was created so that the Debtor's Trustees could administer the Property. [Id.]. The Debtor reserved his right to reside in the Property. [Id. at p. 6 of 26].

---

[2] All exhibits referenced herein were admitted at the hearing held on February 15, 2017.

5. On that same day, November 26, 2001, the Debtor executed another Trust Transfer Deed and transferred his new, separate, 50% interest in the Property to the Debtor's Trustees. [Debtor's Ex. No. 4, p. 1 of 15].

6. Further, on November 26, 2001, Ms. Bird executed a separate Trust Transfer Deed and transferred her new, separate, 50% interest in the Property to Shannon M. Bird and Dylan C. Bird, as Trustees of the Vicki Lynne Bird Residence Trust (the "Ms. Bird Trust"). [Id. at p. 7 of 15].

## B. The Bankruptcy Petitions Filed by the Debtor and Ms. Bird

7. On April 6, 2011, the Debtor filed a Chapter 11 petition in the Southern District of Texas for a company that he owned, Triton 88, L.P. [Case No. 11-33185, Doc. No. 1].

8. On July 11, 2011, the Debtor filed his voluntary Chapter 11 petition in this Court (the "Petition Date"). [Doc. No. 1].

9. On September 27, 2011, Ms. Bird filed her voluntary Chapter 7 petition in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court"). [RES's Ex. No. 8, pp. 11–12 of 17]. John M. Wolfe was appointed as the Chapter 7 trustee in Ms. Bird's bankruptcy case (the "California Trustee"). [Id. at p. 12 of 17].

10. On December 2, 2011, RES filed its proof of claim in the Debtor's case in the amount of $10,981,291.76 (the "Original Claim"). See Claim No. 9 on Claims Register. RES is the successor-in-interest to Multibank 2009-1 RES-ADC Venture, LLC. Id. at p. 4. According to the documents attached to the proof of claim, RES asserted that its claim arose because of a community debt against community property for a guaranty that Ms. Bird had signed in 2007. Id. at p. 5. The claim specifically sets forth that it was "not

asserted against the Debtor individually but only to the extent the Debtor has community property which would be responsible for the community debt." *Id.* at p. 4.  On July 13, 2013, RES amended the Original Claim but did not include any attachments (the "Amended Claim"), nor did the Amended Claim include any language limiting payment of the claim to community property. *See* Claim No. 11 on Claims Register.

11. On August 8, 2011, the Debtor filed his schedules.  [Doc. No. 25].  Under "other personal property of any kind not already listed," the Debtor listed a "[r]ight to live in [a] house held in qualified residential trust."  [*Id.* at p. 6 of 43].  He represented that this trust was established in 2001 and that he had no ownership interest in the house (i.e., the Property). [*Id.*].

12. On November 2, 2011, the Debtor filed his Motion to Convert to Chapter 7 representing that he could not continue with reorganization because it was not in his best interest. [Doc. No. 40, p. 2 of 3].

13. On December 5, 2011, the Court granted the Debtor's Motion to Convert to Chapter 7. [Doc. No. 44].  On that same day, Joseph Hill was appointed as the Chapter 7 trustee (the "Trustee").

14. On March 9, 2012, RES initiated an adversary proceeding against Ms. Bird in the California Bankruptcy Court.  [Doc. No. 162-1, p. 3 of 45].

15. On March 14, 2012, the Debtor filed his amended schedules.  [Doc. No. 55].  Under item fourteen, the Debtor listed an interest in the "BJ Bird Residence Trust" representing that he has a "[r]ight to live in [a] house held in qualified residential trust" and that he had a "1/2 interest owned in the property in California."  [*Id.* at p. 3 of 47].

16. On June 14, 2012, this Court entered an order discharging the Debtor.  [Doc. No. 74].

17. On June 24, 2013, the California Bankruptcy Court entered a judgment in favor of RES against Ms. Bird in the amount of $10,981,291.76. [RES's Ex. No. 7]. In an attempt to collect its judgment, RES began an asset investigation, [Doc. No. 181, pp. 2–3 ¶ 6], which led to the adversary proceedings described below.

## C. The Adversary Proceedings

18. On July 9, 2013, the Trustee filed, in this Court, his Complaint for Avoidance and Recovery of Fraudulent Transfer (the "Fraudulent Transfer Action"), styled *Joseph M. Hill, Trustee v. The B.J. Bird Residence Trust, Shannon M. Bird, Trustee and Dylan C. Bird, Trustee* (Adv. Proc. No. 13-03154). [Doc. No. 82]. In this action, the Trustee sought recovery of "no less than the fair market value of the Property." [*Id.* at p. 2 ¶ 5].

19. On April 15, 2014, the Honorable Lynn Hughes, U.S. District Judge for the Southern District of Texas, entered an Order Withdrawing the Reference of the Fraudulent Transfer Action. [Doc. No. 98].

20. On June 24, 2014, in the California Bankruptcy Court, the California Trustee commenced an adversary proceeding against Ms. Bird, individually, and the trustees of the Ms. Bird Trust ("Ms. Bird's California Adversary"). [RES's Ex. No. 8, p. 12 of 17]. The California Trustee sought turnover under § 542 of the 50% interest that the Ms. Bird Trust held in the Property. [*Id.*].

21. On November 12, 2014, the Trustee initiated an adversary proceeding in the California Bankruptcy Court against the Debtor individually, the Debtor's Trust, and the Debtor's Trustees (the "Debtor's California Adversary"). [RES's Ex. No. 8]. The Trustee filed this action for declaratory relief under Rule 7001(9) and § 542 and for turnover of all of the interest of the Debtor's Trust in the Property. [*Id.* at p. 6 of 17].

22. On December 24, 2014, the Debtor initiated, in this Court, an adversary proceeding styled *Bill Jay Bird v. Joseph M. Hill, et al.* (Adv. Proc. No. 14-03372) (the "Bird Adversary"). [Doc. No. 108]. The Debtor filed a complaint alleging that the Trustee initiated an action in the California Bankruptcy Court against the Debtor, individually, in violation of the discharge injunction, [*id.* at p. 4 ¶¶ 18–21], and in contempt of court, [*id.* at p. 5 ¶ 24].

23. On March 25, 2015, Ms. Bird's California Adversary and the Debtor's California Adversary were consolidated. [Doc. No. 181, p. 4 ¶ 11].

24. On that same day, the Debtor was dismissed from the Debtor's California Adversary by stipulation of the parties. [*Id.*].

25. On December 15, 2015, the Trustee filed, in this Court, his Motion to Compromise Controversy (the "Compromise"). [Doc. No. 161]. The Compromise was intended to settle all of the adversary proceedings pending in the California Bankruptcy Court and in this Court. [*Id.* at p. 5–6 ¶¶ 15, 17]. In exchange for the Trustee ensuring that the Debtor was not an *individual* party in the Debtor's California Adversary and, further, in exchange for the Trustee resolving all of the claims that he brought, or could have brought, in Ms. Bird's California Adversary and in the Debtor's California Adversary, the Debtor agreed to the validity of RES's claims. [*Id.*]. The Compromise attached a settlement agreement (the "Settlement Agreement"), which states that the Debtor agrees that "*any and all proofs of claim filed by [RES] in the Bankruptcy Case and/or the California Actions constitute valid claims under the Bankruptcy Code, and the Debtor agrees herein that he will not file, pursue, object, join in, and/or assist in any objection and/or otherwise contest the Proofs of Claim . . . .*" [Doc. No. 161-2, p. 1 of 2 (emphasis

added)].  Both the Trustee and the Debtor signed the Settlement Agreement.  [*Id.* at p. 2 of 2].

26. Further, the Compromise also included another agreement between the California Trustee, the Trustee, RES, and Ms. Bird (the "Ms. Bird Settlement Agreement").  [RES's Ex. No. 5].  Ms. Bird and the other parties aligned with her[3] agreed to pay $1.0 million to the Trustee for him to distribute to the holders of allowed claims in this pending Chapter 7 case (the "Settlement Proceeds").  [*Id.* at p. 4].  In exchange, all of the adversary proceedings, i.e., the Ms. Bird California Adversary, the Debtor's California Adversary, the Bird Adversary, and the Fraudulent Transfer Action, were dismissed.  [*Id.* at pp. 4, 10].  The signatories to the Ms. Bird Settlement Agreement were  the Trustee, the California Trustee, RES, the trustees of the Ms. Bird Trust, and Ms. Bird.  [*Id.* at pp. 13–15].

27. On December 21, 2015, the Trustee filed his Amended Motion to Compromise Controversy.  [Doc. No. 162].  The only difference between this amended motion and the Compromise is that certain language set forth in the Compromise was stricken on page six of the amended motion.  [*Id.* at p. 6 ¶ 16].

28. On January 28, 2016, the Court held a hearing on the Compromise, and the parties adduced testimony and introduced exhibits.  On that same day, the Court entered an order approving the Compromise.  [Doc No. 167].

**D.  The Trustee's Motion for Distribution**

29. On December 8, 2016, the Trustee filed his Motion for Authority to Make Interim Distribution (the "Distribution Motion").  [Doc. No. 175].  The Trustee requests authority

---

[3] These other parties include the Debtor's Trust, the Ms. Bird Trust, and the trustees of the Debtor's Trust and the Ms. Bird Trust. [RES's Ex. No. 5, p. 5].

to disburse $750,000.00 as follows: (1) American Express - $1,193.72; (2) United States Trustee - $325.00; and (3) RES - $748,481.28. [*Id.* at p. 3 ¶ 6]. In total, the Trustee holds $995,944.91 for the estate, and proposes to retain the remaining $245,944.91, which according to the Trustee is "sufficient monies to pay all administrative expenses to the extent allowed and all future administrative expenses which may be incurred as well as provide a sufficient reserve for unforeseen costs." [*Id.*].

30. On December 28, 2016, the Debtor filed his Objection to the Distribution Motion (the "Distribution Objection"). [Doc. No. 177]. The Debtor objects to the Distribution Motion, asserting that the Trustee is not authorized to make the distribution to RES because RES filed a proof of claim for only community property and the proposed distribution of $748,481.28 is not community property.[4] [*Id.* at pp. 10–12]. The Debtor emphasizes that he does not believe objecting to the distribution is an objection to RES's claim and that therefore he is not breaching the terms of the Settlement Agreement. [*Id.* at p. 12 ¶ 74]. The Debtor does not, however, make note of the fact that if this Court sustains the Distribution Objection—thereby prohibiting RES from receiving the $748,481.28—then the funds will eventually go to the Debtor himself, as there are no

---

[4] In his pleadings and at the hearing on the Distribution Motion, the Debtor has sometimes categorized the Settlement Proceeds as "non-community property" and at other times categorized these funds as "separate property" (although it is not clear whether he intends to convey that this "separate property" is his separate property or the separate property of some third party). Hereinafter, rather than this Court referring to both of these categories, it will simply use the phrase "non-community property" as this term encompasses both the Debtor's separate property as well as any property derived from third-parties (i.e., from someone other than the Debtor or Ms. Bird). Whenever the Court does refer to "separate property," it is because either the Trustee or RES has expressly used this phrase in their respective arguments.

allowed claims other than those of American Express, the United States Trustee, and RES.[5]

31. On January 25, 2017, the Trustee filed his Trustee's Response to the Distribution Objection (the "Trustee's Response"). [Doc. No. 178]. The Trustee makes two arguments against the Distribution Objection. First, he argues that the Distribution Objection violates the Settlement Agreement because an objection to the distribution is essentially an objection to RES's proof of claim. [*Id.* at p. 2 ¶¶ 3–5]. Second, the Trustee argues that under § 726(c)(2), even if the Settlement Proceeds constitute the Debtor's separate property, they can still be used to pay a community claim. [*Id.* at p. 3 ¶¶ 7–8].

32. On January 27, 2017, RES filed a response to the Distribution Objection (the "RES Response"). [Doc. No. 181]. RES makes three arguments against the Distribution Objection. First, it asserts that the Distribution Objection violates the Settlement Agreement. [*Id.* at pp. 7–8 ¶¶ 19–22]. Second, RES contends that even if the funds that the Trustee proposes to distribute to RES are separate property, they could still be used to satisfy a community claim under § 726(c)(2). [*Id.* at pp. 8–9 ¶¶ 23–25]. Third, RES argues that equity estops the Distribution Objection because it would be unfair to allow the Debtor to receive both a discharge and a windfall distribution of several hundred thousand dollars. [*Id.* at p. 10 ¶ 27].

33. On February 13, 2017, the Debtor, the Trustee, and RES each submitted briefs supporting their respective arguments in preparation for a hearing. [*See* Doc. Nos. 194, 196, & 197]. In the Trustee's brief, aside from making the same arguments that he made in the

---

[5] The Debtor does **not** oppose the Trustee's proposed distribution to American Express and the United States Trustee. He opposes only the proposed distribution of $748,481.28 to RES, which is obviously the lion's share of the proceeds held by the Trustee.

Trustee's Response, the Trustee also asserted as an alternative argument that the distribution to RES can be made pursuant to § 726(a). [Doc. No. 196, pp. 5–6 ¶ 9]

34. On February 15, 2017, the Court held a hearing regarding the Distribution Motion and the Distribution Objection. Counsel for the Trustee adduced testimony from the Trustee; counsel for the Debtor cross-examined the Trustee, and all of the parties introduced exhibits without objection. The Court then issued an oral ruling that: (1) the Settlement Agreement prohibits the Debtor from objecting to the Distribution Motion; and (2) the Amended Claim is a valid and enforceable claim that supersedes the Original Claim that the Trustee must pay.[6] [Hr'g held on Feb. 15, 2017 at 2:10:06–2:12:20 P.M.]. This Memorandum Opinion memorializes the Court's oral ruling.

### III.   CONCLUSIONS OF LAW

### A. Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

1. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

---

[6] The Court also issued an oral ruling that even if the Settlement Agreement did not prohibit the Debtor from objecting to the Distribution Motion, the Trustee could still make the distribution to RES under § 726(c)(2). Having reviewed the evidence once again since issuing the oral ruling, the Court has concluded that there is insufficient evidence to establish that the Trustee is holding both community property and non-community property, and therefore, the Court concludes that § 726(c)(2) cannot be applied. *In re Robertson*, 203 F.3d 855, 863 (5th Cir. 2000) ("Section 726(c) governs distributions in cases in which there is *both community property* ('property of the kind specified in section 541(a)(2) of this title') *and non-community property* of the estate.") (emphasis added). Hence, the Court withdraws its conclusion that the Trustee is authorized to make the distribution under § 726(c)(2). However, as subsequently discussed herein, the Court concludes that regardless of how the Settlement Proceeds are characterized, the Trustee is authorized to make a distribution to RES pursuant to §§ 502(a)(2) and 726(a)(2).

The particular issue at bar constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it affects the administration of the estate:  If the Court grants the Distribution Motion, then the Debtor's creditors will receive payments on their respective claims, but if the Court denies this motion, one of the creditors—i.e., RES—will receive nothing. Further, this issue is a core proceeding under 28 U.S.C. § 157(b)(2)(B) because the Distribution Objection is a not-so-subtle attempt by the Debtor to object to the claim made by RES against the estate.  Moreover, the dispute at bar is a core proceeding under 28 U.S.C. § 157(b)(2)(O) because the outcome affects the debtor/creditor relationship:  The funds that the Trustee wants to pay to RES will go either to RES or to the Debtor.  Additionally, the issue at bar is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").  Stated differently, the dispute at bar can only arise in a bankruptcy because the fight is over whether the Trustee will be allowed to make a distribution to a holder of an allowed unsecured claim.

### 2. Venue

Venue is proper under 28 U.S.C. § 1408(2) because the Debtor's company, Triton 88, L.P., had a Chapter 11 case pending in the Southern District of Texas at the time the Debtor himself filed his own petition.  [Finding of Fact No. 7].

3.  <u>Constitutional Authority to Enter a Final Order</u>

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any dispute pending before it.  In the case at bar, the Trustee proposes an interim distribution.  The case law appears to be split as to whether an interim distribution paying claims constitutes a final order.  *See e.g.*, *In re Funderburgh*, 526 B.R. 361, 369 (10th Cir. B.A.P. 2015) ("Although the bankruptcy courts Order Authorizing Distribution permits Trustee to make 'interim' distributions, we conclude it is final for purposes of appeal."); *contra Gache v. Balaber-Strauss*, 198 B.R. 662, 664 (S.D. N.Y. 1996) ("[A] decision approving a partial payment of fees to a trustee/attorney whose meter is still running simply is not . . . a final decision.") (internal quotation and citation omitted); *In re Partial Hosp. Inst. of Am.*, 281 B.R. 728, 734 (Bankr. S.D. Ala. 2001) ("Interim distributions are interlocutory in nature.").  Because of this split, this Court, out of an abundance of caution, will assume that its order approving the Distribution Motion could be a final order and that, therefore, this Court should undertake a *Stern* analysis as to whether it has authority to enter a final order.

In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503.  The pending dispute before this Court concerning the Distribution Motion and the Distribution Objection is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O). *See also In re Brabham*, 184 B.R. 476, 482 (Bankr. D.S.C. 1995) ("[A] Bankruptcy Court should exercise its jurisdiction to determine issues of dischargeability of debts which are brought before it and must consider issues related to

13

enforcement of the discharge injunction of § 524.”); *In re Tulloch*, 373 B.R. 370, 375 (Bankr. D.N.J. 2007) (“Exception-to-discharge adversary proceedings are ‘core proceedings’ arising under title 11 and, as such, bankruptcy judges may ‘hear and determine’ such matters and ‘enter appropriate orders and judgments’ therein.”).   Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here.   A core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O) is entirely different from a core proceeding under 28 U.S.C. § 157(b)(2)(C).   *See, e.g.*, *Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) (“Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional.”); *see also In re Davis*, 538 Fed. App’x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S. Ct. 1002 (2014) (“[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to ‘counterclaims by the estate against persons filing claims against the estate,’ *Stern* expressly provides that its limited holding applies only in that ‘one isolated respect.’ . . . We decline to extend *Stern*’s limited holding herein.”).

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under 28 U.S.C. § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) (“*Stern*’s ‘in one isolated respect’ language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . .”), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar.   In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, the dispute involves both state law (regarding contract interpretation) and two

14

express Code provisions—namely, §§ 502 and 726.   This Court is therefore constitutionally authorized to enter a final order on Distribution Motion.

Finally, in the alternative, this Court has the constitutional authority to enter a final order on the Distribution Motion because the parties have consented, impliedly if not explicitly, to adjudication of this dispute by this Court.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed.  We disagree.  Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed.  Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").   Indeed, the Trustee filed the Distribution Motion, [Finding of Fact No. 29]; the Debtor filed the Distribution Objection, [Finding of Fact No. 30]; the Trustee filed the Trustee's Response, [Finding of Fact No. 31]; RES filed the RES Response, [Finding of Fact No. 32]; all of the parties filed their respective briefs [Finding of Fact No. 33]; and all of the parties proceeded to make a record at the February 15, 2017 hearing without ever objecting to this Court's constitutional authority to enter a final order on the Distribution Motion.  This Court finds that these circumstances constitute consent to this Court entering a final order on the Distribution Motion.

## B. The Distribution Objection Violates the Settlement Agreement Under Both Texas and California Law, and Therefore the Debtor is Barred from Objecting to the Distribution Motion

In the first instance, the Court overrules the Distribution Objection because it violates the Settlement Agreement.   The Court arrives at this decision pursuant to its analysis of the Settlement Agreement under both Texas and California Law.

1. <u>According to Choice of Law Principles, Texas Law Applies, but, out of an Abundance of Caution, the Court also Applies California Law to Interpret the Settlement Agreement</u>

When interpreting contracts, federal courts must use choice of law rules of the forum state. *See Ballard v. Devon Energy Prod. Co., L.P.*, 678 F.3d 360, 366 (5th Cir. 2012). Here, Texas is the forum state, as the Debtor filed his bankruptcy petition in the Southern District of Texas. Under Texas law, whenever it is possible that a contract could be governed by the rules of two different states, "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary." *Schneider Nat. Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) (internal citation and quotation omitted). Stated differently, the law of the forum state applies if there is no conflict in the substantive law. *Id.* Here, the Settlement Agreement does not include a choice-of-law provision, and it is possible that both Texas and California have an interest in the Settlement Agreement. Indeed, this is because the Ms. Bird Settlement Agreement does, in fact, include a choice-of-law provision and selects California law for its governance. [RES Ex. No. 5, p. 11].

Nonetheless, both Texas and California interpret contracts according to plain meaning principles. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 159 (Tex. 2003); *see also Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 627 (Cal. 1995). Thus, no choice-of-law analysis is necessary and Texas state law should apply, as Texas is the forum state. However, out of an abundance of caution and because of the Ms. Bird Settlement Agreement's choice-of-law provision, the Court will also apply California state law to show that under either analysis, the result is the same: The Settlement Agreement bars the Debtor from objecting to a proof of claim filed by RES, thereby also barring any objection he has to the Trustee's proposed distribution to RES in partial satisfaction of its allowed, unsecured claim.

2.  Analysis under Texas Law

a.  *Applicable Law*

The "primary concern" in contract interpretation "is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Nustar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461 (Tex. App.—Houston [14th Dist.] June 11, 2013, no pet.).  It is important to read the contract so that no provision is rendered meaningless. *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).  The Court should strive "to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Id.*  The Court should also "avoid a construction that is unreasonable, inequitable, and oppressive. *Nustar*, 402 S.W.3d at 466 (citing *Frost Nat'l Bank v. L & F. Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam)).

If the contract is unambiguous, parol evidence is not considered in order to prevent interpretation that conflicts with the plain language of the contract. *Id.*  "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker*, 650 S.W.2d at 393.  A "contract is unambiguous if it can be given a certain or definite meaning as a matter of law." *Id.* (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)). Perhaps most important to the case at bar:  "[A] contract is not ambiguous simply because the parties advance conflicting interpretations." *Id.*

b.  *Application of Texas Law to the Facts at Bar*

As a preliminary matter, the Court does not find the Settlement Agreement to be ambiguous.  Next, the Court finds that the relevant section at issue in the Settlement Agreement reads as follows:  "The Debtor agrees that any and all proofs of claim filed by [RES] in the

17

Bankruptcy Case and/or the California Actions constitute valid claims under the Bankruptcy Code, and the Debtor agrees herein that he will not file, pursue, object, join in and/or assist in any objection and/or otherwise contest the Proofs of Claim." [Finding of Fact No. 25]. The Debtor asserts that this provision means he cannot object to RES's actual proof of claim but that it does not limit him from objecting to the Trustee's proposed distribution to RES. [Finding of Fact No. 30]. In response, the Trustee and RES contend that this provision means that the Debtor has waived his right to object to RES's proof of claim, which also encompasses any objections to the Trustee's proposed distribution of estate funds to RES. [Findings of Fact Nos. 31 & 32]. This Court agrees with the Trustee and RES.

The Court ascertains that it was the Debtor's and the Trustee's intent to globally settle all of the adversary proceedings whereby the Trustee dismissed any claims against the Debtor, the Debtor's Trust, Ms. Bird, and the Ms. Bird Trust (including claims being made against the Property); and, in exchange, the Debtor agreed not to object to "or otherwise contest" any of RES's proofs of claim. [Findings of Fact Nos. 25–28]. Stated differently, it was the intent of all the parties to completely remove the Debtor and Ms. Bird from the litigation and to allow the Bird family to avoid the Trustee taking title to the Property in exchange for a guarantee that RES and other creditors in the Debtor's case would receive distributions on their allowed claims from the Settlement Proceeds. To interpret the language in the Settlement Agreement otherwise would be unreasonable, inequitable, and oppressive.[7]

If the Court accepted the Debtor's interpretation, then the provision regarding the Debtor's consideration—i.e., his promise not to object to RES's claim—would become

---

[7] The Court also notes that as part of the global settlement, the California Trustee received $1.25 million from Ms. Bird and other parties aligned with her. [Doc. No. 161-1, pp. 8–9 of 45]. The Court has no doubt that the California Trustee will distribute this $1.25 million to pay allowed claims in the California Bankruptcy Court just as the Trustee in the case at bar wants to pay allowed claims, which includes RES's allowed unsecured claim.

meaningless in light of the circumstances when the Settlement Agreement was executed. Indeed, when considering whether to approve a proposed settlement, bankruptcy courts consider whether the "settlement is fair and equitable and in the best interest of the estate." *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). Moreover, when considering a motion to compromise "in the bankruptcy context, the interest of the creditors not the debtors are paramount," (*id.* (internal citation and quotation omitted))—and here, RES is unquestionably a large creditor holding an allowed unsecured claim, so its interest is paramount. Indeed, this Court would not have approved the Settlement Agreement if it allowed the Debtor to circumvent the plain language of the Settlement Agreement and afford him the opportunity to object to the Trustee's proposed distribution and then receive a "backdoor" surplus distribution under § 726(a)(6) at RES's expense.

Finally, if this Court accepted the Debtor's interpretation, the phrase "and/or otherwise contest the Proofs of Claim" would be rendered superfluous and meaningless. The Court finds that the parties included this "catch-all" language to encompass instances such as this situation. In sum, for the reasons set forth above, under Texas law, the Settlement Agreement bars the Debtor from objecting to RES's proof of claim, and therefore, the Distribution Objection is overruled.

3. Analysis under California law

a. *Applicable Law*

In California, the first step of contract interpretation is to look to the "plain meaning or the meaning a layperson would ordinarily attach" to the contract. *Waller*, 900 P.2d at 627. It is fundamental that the interpretation of the contract "give effect to the 'mutual intention' of the parties." *Id.* It is preferable to look only to the four corners of the document in order to

understand this intention. *Id.* ("Such intent is to be inferred, if possible, solely from the written provisions of the contract."). This Court's interpretation must therefore be controlled by the "clear and explicit meaning" of the Settlement Agreement, interpreted in its "ordinary and popular sense, unless [language is] used by the parties in a technical sense or a special meaning is given to them by usage." *Id.*

A provision is ambiguous if there are two, reasonable interpretations, but ambiguity must not be found in the abstract. *Id.* If the court is "able to declare the true intent of the parties," then parol evidence is not allowed. *San Diego Flume Co. v. Chase*, 32 Cal. Unrep. 792, 794 (1893). Stated differently, this Court may only use parol evidence if it finds the contract to be ambiguous. *Id.*; *Delta Dynamics, Inc. v. Arioto*, 446 P.2d 785, 787 (Cal. 1968) (holding that extrinsic evidence is allowed only if the court determines that there is more than one reasonable interpretation).

    *b.* *Application of California Law to the Facts at Bar*

As stated previously, the Court does not find the Settlement Agreement to be ambiguous, so it will not consider extrinsic evidence. Here, the issue is whether the Settlement Agreement precludes the Debtor from objecting to the Distribution Motion as an indirect objection to RES's proof of claim. A layperson could read the Settlement Agreement to conclude that the language "or otherwise contest the Proofs of Claim" encompasses an objection to distribution because an objection to distribution interferes with the payment a proof of claim in the same way a direct objection to the proof of claim would. The parties have not indicated that any of the language in the Settlement Agreement is technical, so the Court only interprets it in the ordinary sense. As such, it is clear to this Court that the Settlement Agreement bars both objections to any proof of

claim filed by RES as well as objections to any distribution that the Trustee proposes to make to RES in satisfaction of those claims, in whole or in part.

In sum, under California law, the Settlement Agreement should be construed in a manner that prevents the Debtor from not only objecting to the proofs of claim directly but also indirectly in the form of the Distribution Objection. Therefore, under California law, the Distribution Objection is overruled.

4. <u>Even if the Settlement Agreement is Ambiguous—thus Allowing Parol Evidence to be Introduced—the Evidence Leads this Court to Find that the Debtor is Barred from Objecting to the Distribution Motion</u>

Assuming *arguendo* that the Settlement Agreement is ambiguous, the Court now considers extrinsic evidence. Indeed, both Texas and California law only admit extrinsic, parol evidence if the contract is ambiguous. *See Nustar*, 402 S.W.3d at 466 (Texas); *Arioto*, 446 P.2d at 787 (California). Here, the Court makes an alternative ruling and finds that even if the Settlement Agreement is ambiguous, the evaluation of the extrinsic evidence clearly proves that it was the intent of the parties to bar the Debtor from objecting not only to RES's claim, but also to any distribution to RES.

First, the Trustee testified that when executing the Settlement Agreement, it was the intent of the parties to avoid allowing the Debtor to "have any say so about distributions in the case." [Hr'g held on Feb. 15, 2017 at 1:19:57–1:20:42 P.M.]. Second, the Debtor did not testify to the contrary, so the Court received no evidence contradicting the Trustee's testimony.[8]

---

[8] The Court notes that it expressly gave the Debtor an opportunity to testify. Specifically, during the first hearing on the Distribution Motion held on January 31, 2017, counsel for the Debtor indicated that he would like to introduce exhibits and adduce testimony at a subsequent hearing. [Hr'g held on Jan. 31, 2017 at 10:10:29–10:10:58 A.M.]. The Court therefore continued the hearing to February 15, 2017 to afford the Debtor the opportunity to introduce evidence and adduce testimony to support his position that RES should not receive a distribution on its claim. However, at the subsequent hearing held on February 15, 2017, the Debtor's counsel decline to introduce any evidence in support of the Debtor's position. [Hr'g held on Feb. 15, 2017 at 1:31:33–1:31:36 P.M.].

Accordingly, because the Court has heard credible, uncontroverted testimony from the Trustee that the intent of all the parties when they signed the Settlement Agreement was that the Debtor would have no say about distributions to be made by the Trustee, this Court finds that the Debtor is now barred from objecting in any way to the Distribution Motion.

## C. Even if the Settlement Agreement Does not Bar the Debtor from Objecting to the Distribution Motion, the Court Authorizes the Trustee to Make the Proposed Distribution of $748,481.28 to RES

### 1. Application of §§ 502 and 726 to the Case at Bar

Assuming *arguendo* that the Settlement Agreement does not bar the Debtor from objecting to the Distribution Motion, the Court now considers arguments made by the parties. First, the Trustee and RES argue that this Court should authorize the Trustee should make his distribution to RES pursuant to § 726(c). [Findings of Fact Nos. 31 & 32]. However, as already stated in footnote 6, *supra*, the Fifth Circuit has made it clear that "Section 726(c) governs distributions in cases in which there is *both community property* ('property of the kind specified in section 541(a)(2) of this title') *and non-community property* of the estate." *Robertson*, 203 F.3d at 863 (emphasis added). Here, the record is wholly devoid of evidence that the Trustee is holding both community and non-community property. The record simply reflects that the only property of the estate in existence for the Trustee to distribute are the Settlement Proceeds. [Doc. No. 175, p. 2 ¶ 2]. However, there has been no evidence introduced that a portion of the Settlement Proceeds is community property and that another portion is non-community property. The only finding that this Court can make given the present record is that the Trustee acquired

these funds pursuant to the Settlement Agreement.[9]   Given these circumstances, this Court

cannot apply § 726(c) as the Trustee and RES would like.[10]

Nevertheless, the distribution requested by the Trustee and RES is appropriate pursuant

to other sections of the Code. First, the Amended Claim is deemed to be an allowed unsecured

claim pursuant to § 502(a) because no objection has ever been lodged to this claim. *In re*

*Rodriguez*, No. 16-70150, 2017 WL 571488, at *4 (Bankr. S.D. Tex. Feb. 13, 2017); *In re Lewis*,

80 B.R. 39, 40 (Bank. E.D. Pa. 1987). And, because the Amended Claim is an allowed

unsecured claim in this Chapter 7 case, RES is entitled to receive distributions from the Trustee

on this claim pursuant to § 726(a)(2). Indeed, this is one of the arguments made by the Trustee

in the Trustee's brief. [Finding of Fact No. 33].

The Debtor articulates two arguments as to why RES should not receive any distribution.

First, the Debtor contends that the Original Claim, not the Amended Claim, is the "live" claim;

that the Original Claim expressly limits payment on the claim to community property, [Finding

of Fact No. 10]; that the Settlement Proceeds are not community property; and that therefore,

---

[9] According to the Debtor's Objection, the funds paid to the Trustee "came from a loan to the [Debtor's Trust] and the [Ms. Bird Trust] . . . secured by a lien and deed of trust on the Property. Neither [the Debtor] nor [Ms. Bird] signed any loan documents for the loan made by the [Debtor's Trust] or the [Ms. Bird Trust]. The borrowers for the loans were the [Debtor's Trust] and the [Ms. Bird Trust] paid to the [Debtor's Trustees] and the Vicki Trustee." [Doc. No. 177, p. 10 ¶ 65]. Assuming that these allegations are true, then the Settlement Proceeds are entirely non-community property—which, once again, means that this Court may not apply § 726(c) to render a granting the Distribution Motion.

[10] If the Court did apply this section, then § 726(c)(2)(D) would apply because it allows for non-community property to be used to pay community claims. This "sub-estate (D)" requires that any unpaid community claims "are paid from whatever property remains in the estate." *Robertson*, 203 F.3d at 863. It is important to note that all property in sub-estate (D) is used to pay community claims not only against the debtor, but also against the debtor's spouse. Here, the community claim would be the claim against the non-debtor spouse, Ms. Bird, held by RES and it would be paid with what the Debtor refers to as non-community property, i.e., the Settlement Proceeds. While it may appear unfair to allow a community claim to be satisfied with non-community property, it remains that this is the way the statute reads and was constructed. *See* H.R. Rep. No. 95-595, at 384 (1977) (Under sub-estate (C), "community claims, to the extent they remain unpaid, and all other claims against the Debtor, are paid from noncommunity [sic] property."); *see also* Alan Pedlar, *Community Property and the Bankruptcy Reform Act of 1978*, 11 ST. MARY'S L.J. 349, 366 (1979).; Margaret Dee McGarity, *Community Property in Bankruptcy: Laws of Unintended Consequences*, 72 LA. L. REV. 143, 147 (2011) (stating that under § 726(c), "creditors might be able to collect from assets not available under state law"). Thus, in this scenario, RES's community claim against the non-debtor spouse, Ms. Bird, could be satisfied with non-community property.

23

RES should receive none of these proceeds. [Finding of Fact No. 30]. The Court rejects this argument because the Original Claim is not in fact the "live" proof of claim: the Amended Claim is. *See Matter of Vitro Asset Corp.*, 656 Fed. App'x 717, 722 n.1 (5th Cir. 2016) ("[J]ust like an amended pleading, an amended proof of claim supersedes the original filing and deprives the earlier filing of legal effect.") (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)). An amended claim will supersede an original claim unless the amended claim "specifically refers to or adopts the earlier [claim]." *Boelens*, 759 F.2d at 508. And here, the Amended Claim does *not* contain any language limiting payment to any particular category of property. [Finding of Fact No. 10]. Therefore, the Amended Claim can be paid with the Settlement Proceeds regardless of how these particular proceeds are categorized (i.e., regardless of whether these funds are community property or non-community property).

Second, the Debtor contends that even if the Amended Claim is the "live" claim, it "has no basis for being allowed since it does not meet the minimum requirements for a proof of claim." [Doc. No. 177, p. 9 ¶ 58]. Stated differently, the Debtor argues that the Amended Claim lacks supporting documents, thereby violating Rule 3001(f). However, a claim that lacks supporting documentation may still be valid because a violation of Rule 3001(f) is *not* one of the "explicit grounds set forth in § 502(b) for the disallowance of a claim." *In re Brunson*, 486 B.R. 759, 769 (Bankr. N.D. Tex. 2013) (stating that this failure does "not result in automatic disallowance"); *see also In re Davis*, No. 09-42865, 2011 WL 1302222, at *8 (Bankr. E.D. Tex. Mar. 31, 2011) (finding that if there is no separate substantive basis for disallowance of a claim, then there is no requirement that the claim *must* be disallowed). Indeed, at the hearing, the Trustee testified that after reviewing the Amended Claim, he personally met with representatives of RES and, in doing so, concluded that the claim is based on a bona fide debt owed by Ms. Bird.

[Hr'g held on Feb. 15, 2017 at 1:25:10–1:25:35 P.M.].   The Debtor offered no evidence contradicting the Trustee's testimony.  The Court finds the Trustee's testimony is credible and gives it substantial weight; and therefore, the Amended Claim, even though it contains no supporting documentation, is a valid claim that should be paid through the Trustee's distribution of a portion of the Settlement Proceeds.

2.   The Trustee is Authorized to Make an Interim Distribution

The Trustee has proposed an interim distribution of $748,481.28 to RES.  [Finding of Fact No. 29].  The Trustee would be making this distribution from the $1.0 million in Settlement Proceeds that he received under the Settlement Agreement.  [Finding of Fact No. 26].   The Trustee contends that after distribution, there would remain sufficient funds to pay all administrative expenses and subsequently provide the creditors with an additional dividend. [Finding of Fact No. 29].

The Court concludes that the Settlement Proceeds are part of the Debtor's Chapter 7 estate because they were an interest acquired after commencement of the Debtor's case. § 541(a)(7).  Indeed, the Settlement Agreement occurred in 2015, four years after the Petition Date.  [*See* Findings of Fact Nos. 8 & 25].  Moreover, the Settlement Proceeds were specifically acquired for the Trustee to distribute to holders of allowed claims.  [Finding of Fact No. 26].  At this time, according to the Trustee's testimony, the bank fees that are accruing on the Trustee's account are depleting precious estate funds from the creditors.  [Hr'g held on Feb. 15, 2017 at 1:16:27–1:17:16 P.M.].  The testimony from the Trustee is as follows:

> Under the issue that was approved by the United States Trustee to allow banks to charge a percentage interest on deposits, the amount of money that's been subtracted from the million dollars that I received in September from the Debtor—or from whoever gave me the million dollars—to settle the matter prior to foreclosure on the [Property].  After, I deposited that in the bank, it's having bank fees taken out of it, there's been about $7,000 deducted from it so far.  So, I

25

> thought it prudent under the circumstances, particularly since most of the money,
> I believe, would go to the claimant, [RES], that we file this motion for
> distribution.

*Id.* The Trustee now asks this Court to approve an interim distribution in order to maximize the

distribution to the creditors.

Typically, distribution is not commenced until the Court approves a trustee's final report

and accounting. *In re Van Gerpen*, 267 F.3d 453, 456–57 (5th Cir. 2001) (citing *In re Wilson*,

190 B.R. 860, 862 (Bankr. E.D. Mo. 1996)). Nonetheless, the Code does not bar an interim

distribution, and when it benefits the estate to do so, the Court is authorized to approve any

interim distribution using its authority pursuant to § 105(a). Here, the interim distribution will

maximize distribution to the creditors because it will decrease the amount lost to bank fees.

Stated differently, an interim distribution right now is in the best interests of the estate. *See In re*

*Energy Co-op, Inc.*, 173 B.R. 363, 372 (N.D. Ill. 1994) (allowing an interim distribution when

the trustee proved that it was in the best interests of the estate). Further, the deadline for filing

proofs of claim has long since passed; [Doc. No. 23, p. 1 of 6 (stating that the deadline was

December 7, 2011)]; thus, there is no risk that any more creditors will suddenly appear seeking a

distribution from the Trustee. Therefore, the Court authorizes the Trustee to make interim

distributions pursuant to the standard distribution scheme of § 726(a), which allows payment of

timely-filed, unsecured claims, such as the Amended Claim.

## IV.   CONCLUSION

By participating in the Settlement Agreement, the Debtor bargained away his right to

object to any proof of claim filed by RES, including any opposition to a distribution from the

Trustee on this claim. The Debtor's baseless attempt now to bypass both the Settlement

Agreement and the Bankruptcy Code is disingenuous. The Debtor sought the protection of the

bankruptcy system and thus, must now abide by the provisions of the Code as well as the Rules—namely, Rule 9019, which allowed the Debtor, together with the Trustee, to obtain this Court's approval of the Settlement Agreement that not only dismissed all of the claims against the Debtor, Ms. Bird, the Debtor's Trust, the Ms. Bird Trust, and the trustees of the trusts therein, but also effectively allowed the entire Bird family to keep a luxurious beachfront mansion for their continued enjoyment.  To now allow the Debtor to raise an objection to the Distribution Motion would circumvent this Settlement Agreement and cause a chilling effect on equitable, fair settlements that are in the best interests of bankruptcy estates.  This, the Court will not allow.

A separate order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed on this 3rd day of March, 2017.

Jeff Bohm
United States Bankruptcy Judge